

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

**FILED**

SEP 3 0 1998

U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

REUBEN HARRIS, JR.,                    ]
                                       ]
    Plaintiff(s),              ]
                                       ]
vs.                                    ]     CV-97-N-1286-W
                                       ]
**STATE OF ALABAMA BOARD OF            ]
PARDONS AND PAROLES, et al.,**         ]
                                       ]
    Defendant(s).              ]
                                       ]

**ENTERED**

OCT 01 1998

**MEMORANDUM OF OPINION**

## I.  INTRODUCTION.

In this employment discrimination case, the plaintiff, Reuben Harris, Jr., ("Mr. Harris"), brings suit against his employer, the State of Alabama Board of Pardons and Paroles ("Board"); his supervisor, William Brazeal ("Mr. Brazeal"); Mr. Brazeal's supervisor, Florene Staggs ("Ms. Staggs"); and the Board's executive director, William C. Young ("Mr. Young"). The plaintiff, a black male, alleges that the defendants discriminated against him on the basis of race and then retaliated against him for filing a grievance complaining of discriminatory conduct. Mr. Harris brings claims against the Board pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Mr. Harris's claims against the remaining defendants are brought pursuant to 42 U.S.C. §1983 for violations of rights under the Equal Protection Clause of the Fourteenth Amendment to the

46

United States Constitution and pursuant to 42 U.S.C. §1981.[1] The individual defendants are sued in their individual capacities for monetary damages, and in their official capacities for declaratory and injunctive relief.[2]

The matter is presently before the court on the defendant's motion for summary judgment, filed July 13, 1998, and addressed to all remaining claims.[3] The motion has been fully briefed and is ripe for decision. Upon due consideration, it will be granted in part and denied in part.

## II.   STATEMENT OF FACTS.[4]

Based upon the evidence presented on the motion, this is the story of an office full of people who simply could not get along. Mr. Harris served for almost ten years under the supervision of defendant Brazeal. From the time of his promotion in 1986 to Officer in Charge of the Board's Tuscaloosa office until his transfer in 1996,[5] Mr. Harris was responsible for supervising the work of the Tuscaloosa clerical staff. In turn, he reported

---

[1] Originally, Mr. Harris filed several claims based on 42 U.S.C. § 1985(3). Based on a joint stipulation by the parties, these claims were dismissed by the court on May 19, 1998.

[2] By order entered December 2, 1997, this court granted summary judgments as to the section 1981 and section 1983 claims against the Board and against the defendants in their official capacity for money damages.

[3] In a related matter, the court has for consideration defendants' motion to strike, filed August 13, 1998, in which the defendants have moved to strike portions of the affidavits of plaintiff and Betty Clark, submitted in support of plaintiff's opposition to summary judgment. Mr. Harris has had an opportunity to respond in the form of plaintiff's opposition to the motion to strike. The court will consider this matter contemporaneously with the motion for summary judgment and will disregard any portions of the affidavit not properly before the court on summary judgment.

[4] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[5] The plaintiff began his employment in the Tuscaloosa office several years earlier. From 1981 until his promotion in 1986, Mr. Harris worked in the office as a probation and parole officer.

to Mr. Brazeal, who is white and served as the district supervisor for the district that includes the Tuscaloosa probation and parole office. However the relationship between these two men may have begun, it suffered a steady decline over the decade they worked together. The conflict between these two supervisors fed off of, and apparently fed, the increasingly contentious atmosphere in the Tuscaloosa office. It is out of the acrimony which plagued that office that this action springs.

Initially, Mr. Brazeal and Mr. Harris appear to have gotten along rather well. Mr. Brazeal gave Mr. Harris consistently excellent reviews up through 1994, *see Defendant's Exhibit 9*, and Mr. Brazeal's deposition testimony suggests that he had no particular problems with the plaintiff during this early period. *See Plaintiff's Exhibit 15 (Affidavit of William Brazeal at* 51-52). The plaintiff suggests by affidavit testimony that the seeds of future trouble had already been sowed, however. Specifically, Betty Clark, who is black and who served as secretary in the Tuscaloosa office both before and after Mr. Harris's tenure as Officer in Charge, indicates in her affidavit that from the beginning Mr. Brazeal gave Mr. Harris less latitude than he had given the prior white Officer in Charge. *See Plaintiff's Exhibit 1 Attachment A (Affidavit of Betty Clark).* Mr. Harris's affidavit makes much the same claim, and indicates that "[f]rom the time of my promotion . . . I was Officer in Charge in name only. Mr. Brazeal constantly did things to undermine my authority." *See Plaintiff's Exhibit 10 (Affidavit of Reuben Harris, Jr.).*[6]

---

[6] Defendants claim that these allegations should be stricken from both affidavits because they are general, conclusory opinions given without personal knowledge of specific facts supporting them.

3

In any event, conflict soon developed: Mr. Brazeal started encountering problems with Mr. Harris in 1991 or 1992. He received reports that Mr. Harris was "irritable." *See Plaintiff's Exhibit 15 (Affidavit of William Brazeal* at 51-52). Eventually, these complaints became more concrete. By 1993, Mr. Brazeal was getting complaints from the parole officers and secretaries in the Tuscaloosa office indicating that Mr. Harris was an incompetent manager. The complaints focused on Mr. Harris's management of the secretaries and, in particular, his apparent favoritism towards Betty Clark, the most senior, and only black, secretary in the office. The employees who complained were all, or almost all, white. *Id.* at 57-60. Mr. Brazeal initially held a meeting and told the Tuscaloosa staff to try to get along. Then Mr. Brazeal apparently called in his boss, Roy Brown, who at the time served as the Board's Director of Field Services for the district encompassing Tuscaloosa. Roy Brown had a meeting with Mr. Harris and Mr. Brazeal on March 12, 1993, in an attempt to resolve the developing problems in the office. *Id.* at 60-64, 69-70; *see also Plaintiff's Exhibit 6.* It is unclear what, if any, action was taken as a result of the meeting.

For his part, Mr. Harris was not too happy with the situation either. On May 6, 1993, Mr. Harris filed a grievance against Mr. Brazeal with Mr. Brown, alleging that the situation had not improved since the March 12 meeting. Mr. Harris complained that Mr. Brazeal was interfering with and undermining his supervisory authority. In particular, the complaint alleges that Mr. Brazeal had removed one of the secretaries from Mr. Harris's supervision, advised another to flaunt Mr. Harris's direct instructions, questioned Mr. Harris's job evaluations of some of the secretaries, and made decisions about the arrangement of and assignment of duties in the office without consulting with Mr. Harris, but with the input of

4

Mr. Harris's white subordinates. *Plaintiff's Exhibit 6.* Though race was not mentioned, the complaint focuses on incidents in which Mr. Brazeal either consulted with or sided with a white employee, while challenging Mr. Harris's decisions or failing to consult him at all.[7] *See id.* Mr. Harris's affidavit indicates that he "suspected at the time that Mr. Brazeal's actions were racially motivated," but "intentionally did not raise this issue in [his] grievance." *Plaintiff's Exhibit 20 (Affidavit of Reuben Harris, Jr.* at 2).

Mr. Brown, apparently already familiar with the situation, responded to the grievance quickly. On May 20, 1998, he sent a memo to Mr. Harris and Mr. Brazeal indicating that the grievance may "have some merit." Concluding that the problem was "in part due to a break down in communication," Brown instructed Mr. Brazeal to give Mr. Harris "the authority and space to do [his] job." *Plaintiff's Exhibit 6.*

This intervention did not solve the problem, however, and tensions continued to mount in the Tuscaloosa office. The office continued to suffer from a high turn-over rate among clerical employees. *See Defendant's Exhibit 10 (Deposition of Reuben Harris, Jr.* at 41) One secretary, who left in 1993, accused Mr. Harris of harassment. *Id.* at 82-83; *see Defendant's Exhibit 1, Attachments (Statement of Gwendolyn Everett).* Conflict between Mr. Harris and Mr. Brazeal also continued. In 1994, Mr. Harris was charged with insubordination by Mr. Brazeal and issued a letter of reprimand. *Defendant's Exhibit 10 (Deposition of Reuben Harris, Jr.* at 44); *Defendant's Exhibit 1, Attachments (Memo from Mr. Brazeal).* Complaints by the personnel in the Tuscaloosa office culminated in a petition

---

[7] One incident mentioned in the grievance involves an allegation by Mr. Brazeal that Mr. Harris was treating an employee too well, by awarding too high a rating on the employee's evaluation. That employee, Betty Clark, was black.

5

of no confidence in Mr. Harris from the parole officers in the Tuscaloosa office, who requested in December of 1994 that he be transferred away.[8] *Defendant's Exhibit 1 Attachments (Petition of No Confidence).*

Defendant Staggs replaced Roy Brown as Director of Field Services soon afterwards, inheriting a Tuscaloosa office in disarray. After assuming her new duties in January of 1995, Ms. Staggs met with Mr. Brazeal and Mr. Harris on February 21, 1995 to discuss "the ongoing problems, the lack of communication [and] the hostility [and] d[y]sfunction of the Tuscaloosa office." *Defendant's Exhibit 2, Tape 1, p. 7 (Testimony of Florene Staggs).* No real progress was made, so an office-wide meeting was held on March 10, 1995. *See id.* The purpose of the meeting was to find the underlying problem in the Tuscaloosa office, and come up with ways to fix it. *Defendant's Exhibit 10 (Deposition of Reuben Harris* at 91-92).

In response to the problems she observed, Ms. Staggs made a number of changes in the Tuscaloosa office. *See Plaintiff's Exhibit 4; Plaintiff's Exhibit 8.* Apparently, these changes only increased the tensions in the office. *See Plaintiff's Exhibit 14.* One secretary wrote to Ms. Staggs complaining about the conditions in the office. *Id.* Another secretary left. *See Plaintiff's Exhibit 4.* Several of the parole officers filed grievances against Mr. Harris. *Plaintiff's Exhibit 16 (Deposition of Florene Staggs* at 41-42.). On April 28, 1995, six employees wrote to Mr. Brazeal expressing their concerns for their own physical safety in

---

[8] Plaintiff notes that the signature of Elbarose Rice, the only other black employee in the office besides Mr. Harris and Ms. Clark, does not appear on this petition. However, Ms. Rice did sign the later memo indicating that the situation in the office was so bad because of Mr. Harris's attitude that the employees feared for their physical safety. *Defendant's Exhibit 1, Attachments (Memo from Tuscaloosa Office).*

light of the "constant and on-going tension in our office." Mr. Harris "seems to view us as enemies," they wrote. "We are not assured that he is in control of himself and we are somewhat afraid of what he might do." *Defendant's Exhibit 1, Attachments (Memo from Tuscaloosa Office).* Mr. Brazeal gave Mr. Harris a poor evaluation for the year ending in September of 1995, justifying his decision based on the complaints he had received and the problems he had observed. *Defendant's Exhibit 9; Defendant's Exhibit 1, Attachments (Memo from Mr. Brazeal).*

Mr. Harris was also upset over conditions in the office. He continued to resent Mr. Brazeal's intrusions onto his authority. On January 29, 1996, Mr. Harris filed an internal grievance against Mr. Brazeal alleging, *inter alia,* race discrimination. *See Plaintiff's Exhibit 7.* Mr. Harris complained about a number of specific instances of interference with his authority, claimed that Mr. Brazeal was harassing him and retaliating against him, argued that the poor evaluation he had received was unfair and unjustified, and concluded with a broad allegation that for racial reasons Mr. Brazeal "has attempted to dilute or abolish any authority" held by either Mr. Harris or Ms. Clark. *Id.*

Mr. Harris filed his grievance with Ms. Staggs. She responded to the grievance in the form of a four-page communication on February 7, 1996. *See Plaintiff's Exhibit 8.* After analyzing and explaining each of Mr. Harris's claims, Ms. Staggs concluded that the grievance had "no merit." *Id.* Ms. Staggs made only a limited investigation of the complaint prior to acting on it, and after the grievance was filed she apparently did not talk further with Mr. Harris about it or ask the other black employees in the office whether they felt the presence of race discrimination. Instead, she relied principally on the knowledge gleaned

7

from her year-long investigation of the problems with the office. *Plaintiff's Exhibit 16 (Deposition of Florene Staggs* at 59-62, 75). These prior discussions led her to conclude that the race problems in the office were caused by Mr. Harris, not directed at him, *id.* Her response to the grievance downplays this point, however, and states only that a mutual lack of respect, not Mr. Brazeal's racism, was the problem in the office. *Plaintiff's Exhibit 8*. Ms. Staggs's response also points out that many of Mr. Brazeal's actions were ordered directly by her, and reminds Mr. Harris that "I was straightforward in the [March 20] meeting when I explained that there would be changes made from my level rather than, as we prefer, according to the chain of command." *Plaintiff's Exhibit 8*. While both Mr. Brazeal and Ms. Staggs admit that they have never intervened in the management of clerical employees in other offices to the same extent as in Tuscaloosa, Ms. Staggs concluded that the interventions complained of were necessary to deal with the problems in the Tuscaloosa office. *Id.*

Both sides agree that by this point the situation in the office was hopelessly antagonistic. Mr. Harris describes the situation as racially polarized, *Defendant's Exhibit 10 (Deposition of Reuben Harris* at 98), and rife with intolerance and racial "cliquishness."[9] *Id.* at 49-51. The dispute is over who was to blame for this situation. According to Mr. Harris, the problem was caused by "Mr. Brazeal, first and foremost," *Defendant's Exhibit 10 (Deposition of Reuben Harris* at 66), and particularly by what Harris perceived as his racist efforts to undermine Mr. Harris's authority. Mr. Brazeal felt that Mr. Harris was

---

[9] Mr. Harris claims that Mr. Brazeal was part of the main, predominantly white clique which caused dissension and undermined his authority. *Id.* at 51, 54, 65.

8

engaged in reverse discrimination and that Mr. Harris's actions caused the difficulties. *See Defendant's Exhibit 1, Attachments (Memo from Mr. Brazeal).* Soon after Mr. Harris's grievance was filed, Mr. Brazeal conducted an investigation and concluded that the Tuscaloosa white clerical staff felt that they were the victims of racial discrimination by Mr. Harris.[10] Mr. Brazeal's report was accompanied by supporting letters from five past and current clerical employees. *See Plaintiff's Exhibit 9; Defendant's Exhibit 1, Attachments (Memo from Mr. Brazeal).*

After receiving Mr. Harris's grievance and Mr. Brazeal's report, Ms. Staggs apparently reached the conclusion that Harris was the real culprit, or at least that the problems in the office could not be resolved while he worked there. On March 15, 1996, about a month after she responded to Mr. Harris's grievance, Ms. Staggs submitted a request to Assistant Executive Director Don Drasheff that a departmental disciplinary hearing be convened to hear testimony concerning charges that had been brought against Mr. Harris, including charges of disruptive conduct, racial discrimination, failing to act as an officer in charge, failing to perform his job properly, and failing to cooperate with coworkers. *See Plaintiff's Exhibit 9.* Ms. Staggs noted that Mr. Harris had "cited Racism as a problem" in the office in his prior grievance. She now concluded that "[i]t is the white employees who feel the brunt of discrimination." *Id.* at 2.

---

[10] The exact timing of this report is hard to determine. A memorandum from Ms. Staggs refers to a report dated February 22, 1996. *Plaintiff's Exhibit 9.* The record contains a memorandum which seems to match this description. It is dated January 23, 1996, but seems to refer to attached letters which are dated February 7, 1996. *Defendant's Exhibit 1, Attachments (Memo from Mr. Brazeal and letters following).* Either a date is wrong somewhere, or there are two reports with two sets of letters that have been mixed together in the record. The court cannot discern the true facts here.

9

Based on the assessments of Ms. Staggs and Mr. Brazeal, and facing pressure from the employees in the Tuscaloosa office, who apparently threatened the Board with a lawsuit, *see Plaintiff Exhibit 4 (Resignation of Sarah M. Wright* at 2), the Board's management decided to institute disciplinary proceedings. On April 18, 1996, Mr. Harris was notified by Mr. Young that it had been brought to the attention of the department that Mr. Harris had engaged in "actions or lack of action which possibly violate[d] the Department's policies" and that a disciplinary hearing on the matters was set for May 28, 1996, at 10:00 a.m. *See Defendant's Exhibit 1.* The specific charges against Mr. Harris were detailed in Mr. Young's letter to the plaintiff. *See id.* They included general charges of racial discrimination[11] and an abusive approach towards management, and alleged that poor office efficiency was the result. Specific instances of such conduct were also cited, some of which involved the same incidents referred to in Mr. Harris's grievance against Mr. Brazeal. A charge of disruptive conduct was also brought, which involved an angry outburst by Mr. Harris which formed the focus of Mr. Brazeal's earlier report. *Id.*

At the hearing on May 28, 1996, witnesses were called by the department to present evidence in support of the charges against Mr. Harris. After a full day of hearing evidence, a recess was taken. When the hearing reconvened on May 30, 1996, Mr. Harris, via his attorney, requested a settlement. *See Plaintiff's Exhibit 20 (Affidavit of Reuben Harris, Jr.,* at 3). Mr. Harris requested[12] and was granted a transfer to the Cullman, Alabama, office as

---

[11]This charge was dropped at the beginning of the disciplinary hearing.

[12] Mr. Harris claims that, although he "did not initiate discussion regarding settlement," *see Plaintiff's Exhibit 1 (Affidavit of Reuben Harris, Jr.,* at 3), his "attorney approached him regarding settlement." *Id.*

10

a Probation and Parole Officer III in exchange for the Board's terminating the pending disciplinary action against Mr. Harris.[13] *See Defendant's Exhibit 3 (Board Order dated July 22, 1996).* Apparently, Mr. Harris desired the transfer to Cullman "in order to reduce the expenses [he] was incurring to oppose the Board's [disciplinary] action." *Plaintiff's Exhibit 20 (Affidavit of Reuben Harris, Jr.,* at 3*).*

On August 14, 1996, after voluntarily transferring to the Cullman office, Mr. Harris filed an EEOC Charge of Discrimination against the defendants alleging racial discrimination and retaliation. Mr. Harris received a copy of his Notice of Right to Sue on or about February 28, 1997. On May 23, 1997, Mr. Harris filed a civil complaint in this court.

## III.   SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of

---

[13] Apparently, the settlement did not include a release of liability in favor of the Board with regard to possible future litigation by Mr. Harris.

11

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard

12

necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. THE CLAIMS.

The complaint is not a model of clarity. The court is well aware of the Eleventh Circuit's recent emphasis on proper pleading, and the heightened pleading standard that court imposes for claims based on 42 U.S.C. § 1983. *See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998). Nonetheless, the court cannot agree with defendants that the complaint is so flawed that it should be dismissed for failure to meet the requirements of Rule 8(a) of the Federal Rules of Civil Procedure. The amended complaint sets out fairly specifically the core facts on which liability allegedly rests, and then states claims referring to the particular rights allegedly violated. Rule 8(a)'s notice pleading standard requires no more. While the court would certainly prefer a more precise link between facts and law in all the complaints it sees, the amended complaint is sufficient to put the defendants on notice of the bases of plaintiff's action.

Plaintiff's § 1983 claims must cross a significantly higher hurdle, however. In cases in which claims are brought pursuant to section 1983, the Eleventh Circuit has substantially "tightened the application of Rule 8 . . . in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim." *GJR Investments* at 1367. "This is particularly true in cases involving qualified immunity, where [the Court] must determine whether a defendant's actions violate a clearly established right." *GJR*, 132 F.2d at 1367. Thus, the heightened pleading requirement is the standard to be used by the plaintiff in crafting claims under section 1983, and the standard by which a court will determine the sufficiency of the pleading. *See id.*

14

Nonetheless, the court concludes that plaintiff has properly pleaded at least some section 1983 claims. Defendants note that the plaintiffs have not separated the various claims into individual counts, isolated the facts relevant to each one, and indicated clearly which defendants are sued based on which claims. Defendants suggest on this basis that the plaintiffs have failed to meet *GJR*'s standards. While the court agrees that an undifferentiated list of facts and law constitutes deplorable pleading practice, the Eleventh Circuit has never specifically required separate counts under the *GJR* standard. Instead, *GJR* takes a practical perspective. To state a claim under section 1983, a plaintiff must indicate specifically what facts a claim is based on, and what constitutional right has allegedly been violated. *Id.* at 1367-68. Reference either to vague factual allegations or to generalized "constitutional rights" will not suffice. Here, the court does find references to specific factual allegations and constitutional rights which, though not linked in independent counts, are sufficiently closely related that it is clear they are meant to go together. Though the complaint skirts the edges of sufficiency, as a practical matter it is clear enough what the claims are, and *GJR*'s test is satisfied.

Specifically, the plaintiff alleges that Mr. Brazeal discriminated against him because of his race by undermining and limiting his supervisory authority. *Amended Complaint* ¶¶ 12-13, 23. He claims Ms. Staggs' failure to investigate and correct the problems noted in Mr. Harris's grievance was also racially discriminatory. *Id.* ¶¶ 15-24. According to the complaint, defendants Brazeal, Staggs, Young and the Board unlawfully retaliated against Mr. Harris when he filed his grievance against Mr. Brazeal by bringing him up on disciplinary charges. *Id.* ¶¶ 14, 16-18, 26. He claims the same actions were also racially

15

discriminatory. *Id.* ¶ 26. Finally, the plaintiff asserts that defendant Young placed Mr. Harris on administrative leave pending the conclusion of the disciplinary proceedings for racially discriminatory reasons. *Id.* ¶¶ 20-21.

Based on these allegations, the plaintiff claims several violations of statutory and constitutional law. Under the pleading standards described above, the court identifies the following four properly pled claims that are still pending: 1) Title VII race discrimination against the Board,[14] *id.* ¶¶ 31, 34; 2) Title VII retaliation against the Board, *id.* ¶ 34; 3) a section 1981 claim against the individual defendants in their individual and (for injunctive relief) official capacities for "depriving [Mr. Harris] of employment and contractual opportunities," *id.* ¶¶ 6-8, 31; 4) a section 1983 claim against the individual defendants in their individual and (for injunctive relief) official capacities based on violations of the Equal Protection Clause of the Fourteenth Amendment.[15] *Id.* ¶¶ 6-8, 32-33.

_____

[14] The complaint suggests the Board has a "pattern and practice of discrimination." *Id.* at 29. The plaintiff has made no attempt to provide the evidence required to support a claim of generalized discrimination, so the court will simply ignore this allegation.

[15] This claim is the least clearly pleaded, which is troublesome because it is governed by *GJR's* heightened pleading standard. Plaintiff purports to claim against all defendants for violating section 1983 by "depriving him of the right and privilege to work free from discrimination," *id.* ¶ 32. Of course, section 1983 creates no such right. It creates no rights at all. This sounds like an equal protection claim, but the term "equal protection" is not mentioned. It does appear in the next paragraph of the complaint, however, which alleges that the *Board* "subjected [Mr. Harris] to the deprivation of equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution" in violation of § 1983. *Id* at 33. Oddly, the individual defendants are not mentioned, and the claims against the Board have already been dismissed. Plaintiff thus never managed to connect the right equal protection language with the right defendants, which could cause a problem under *GJR*. However, the court is inclined to view these neighboring claims as sufficient to put the defendants on notice of the precise claims against them, even under *GJR's* heightened pleading standard. Unlike *GJR*, where the "words 'equal protection' [did] not appear anywhere in the complaint," *GJR*, 132 F.3d at 1367, plaintiff managed to get the right idea, the right defendants, and the right language sufficiently close together for his claim to survive. The court cautions counsel to be more careful in the future, however.

## V.   DISCUSSION.

The court will discuss each of these claims in turn. However, while the legal issues vary, the underlying contentions of the parties are similar for all of these claims, and it will be helpful to review them now. Essentially, the defendants argue that the plaintiff has no case because all of the adverse action taken against him were fully justified by his mishandling of the Tuscaloosa office and the resulting dysfunction of that office. Plaintiff responds that the defendants, especially Mr. Brazeal, have been discriminating against him from the beginning of his tenure as Officer in Charge, that it is their discriminatory interference with his authority that caused the problems in the office, that they, and not he, were really in charge, and that blaming him for the problems is therefore unfair and serves only as a pretext for further discrimination. In other words, each side has charged the other with racism and mismanagement. The court suspects that there is some truth to both sides of the story, though the conflict has gone on so long that "at this point it's kind of hard to tell who actually did what." *Defendant's Exhibit 10 (Deposition of Reuben Harris* at 66). The court does not envy any jury called on to sort out this resulting mess. Luckily, however, the court is not called on today to decide who did what. The only question at the summary judgment stage is who can legally prove what. That analysis follows.

### A.   Racial Discrimination.

Title VII of the Civil Rights Act provides, in part, that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In order to prevail on a claim of race discrimination under Title VII, the plaintiff must prove

17

that the Board acted with a discriminatory purpose,[16] and that this purpose affected the

terms and conditions of his employment. *Nix v. WLCY Radio/Rahall Communications*, 738

F.2d 1181, 1184 (11th Cir. 1984). Mr. Harris can create a rebuttable presumption of

discriminatory intent by establishing a *prima facie* case. *Young v. General Foods Corp.*,

840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). This may be done in

three ways: (1) "by presenting direct evidence of discriminatory intent; (2) by meeting the

test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), or (3) by

demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*,

907 F.2d 1077, 1081 (11th Cir. 1990.)

"Direct evidence of discrimination would be evidence which, if believed, would

prove the existence of a fact without inference or presumption." *Carter v. City of Miami*,

870 F.2d 578, 581-582. (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks,

whose intent could be nothing more than to discriminate . . . constitute direct evidence of

discrimination." *Id.* at 582 (footnote omitted). A pattern and practice of gender or racial

discrimination can be established by presenting statistical evidence showing wide-spread

discrimination against a particular race. *See Early,* 907 F.2d at 1081. Mr. Harris has not

directed this court's attention to anything that remotely resembles direct evidence, and has

not attempted to make the statistical case required for a pattern and practice claim.

Therefore, he must establish a *prima facie* case of discrimination, if at all, through

---

[16]Where an entity like the Board is concerned, this means that an agent of the Board acted with discriminatory intent under circumstances in which the Board can be held responsible for that agent's conduct.

circumstantial evidence under the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a discrimination claim based on circumstantial evidence has the burden of establishing a *prima facie* case of discrimination. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present "significantly probative" evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations

19

omitted) (alterations in original). The plaintiff may prove that the defendant intentionally discriminated against him "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

To make out his *prima facie* case Mr. Harris must first identify specific actions by the Board which affected the terms and conditions of his employment, and then match these actions with "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). What these facts are depends on the circumstances, so that the *prima facie* case concept is flexible and the elements may vary slightly from case to case. Generally, however, to make out a claim of race discrimination, the plaintiff must show that he was not treated in the same way as other employees of different races. Thus, in cases involving adverse employment actions, like the reduction of authority and discipline involved here, the plaintiff must show: 1) he belongs to a racial

20

minority; 2) he was subjected to adverse job action; 3) his employer treated similarly situated employees more favorably; and 4) he was qualified to do the job.[17] *Id.* at 1555.

## 1.  The 180 Day Time Bar.

As a threshold matter, defendants seek to limit the adverse actions Mr. Harris can base his claim on because some of the actions taken by the Board were not raised in a timely EEOC charge. Title VII requires that an employee file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5; *Welty v. S.F. & G., Inc.*, 605 F. Supp. 1548, 1553 (N.D. Ala. 1985). Therefore, a Title VII claim cannot be based on discriminatory actions taken more than 180 days before the EEOC charge was filed. Mr. Harris filed his EEOC charge on August 14, 1996, making claims based on any action taken before February 16, 1996 untimely.

Mr. Harris attempts to resurrect his time-barred claims by invoking the continuing violation exception to the 180 day rule. In a lawsuit claiming that a defendant engaged in a continuous course of conduct that caused damage, plaintiffs can recover for damages that preceded the limitations period if they stem from a persistent process of illegal discrimination. *Tyus v. Urban Search Management*, 102 F.3d 256, 265-66 (7th Cir. 1996), *reh'g denied*, Jan. 6, 1997, *cert. denied*, 117 S. Ct. 2409 (1997).

---

[17] If the limitations on Mr. Harris's authority were considered as denials of the rights and privileges of his position, beginning from the time he was promoted into the job, a slightly different formulation might apply. In such a situation, "plaintiff's prima facie case consists of showing that: 1) [he] is a member of a protected class, 2) was similarly situated with a person outside of the protected class, but 3) was denied a condition of employment afforded that person." *Thompkins v. Morris Brown College*, 752 F.2d 558, 562 n.7 (11th Cir. 1985). The key requirement, showing disparate treatment of a similarly situated person, remains the same, however.

In determining the existence of a continuing violation, the Eleventh Circuit distinguishes between the "'present consequence of a one-time violation,' which does not extend the limitations period, and the 'continuation of a violation into the present,' which does."[18] *Beavers v. ACIPCO*, 975 F.2d 792, 796 (11th Cir. 1992). A continuing violation is not merely the perpetuation of the effect of a previous act of discrimination committed outside of the filing period. *United Airlines v. Evans*, 431 U.S. 553, 558 (1983). Nor is it an unconnected string of discrete discriminatory acts against the plaintiff. A persistent, on-going pattern of similar discriminatory acts is required.[19] For this reason, the continuing violation exception is most typically applied to an action like a hostile environment claim, where the charge, by its own terms, necessitates a pattern of incidents occurring over an extended period and where often the unlawfulness is not apparent until the incidents can

---

[18]The case of *Knight v. Columbus, Ga.*, apparently enunciates the present state of the law in this regard. There, the court, quoting *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980), stated:

> "[T]he critical question is whether any present violation exists. . . . [W]here the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer [presently refuses to rectify its past violation will not satisfy the statute of limitations]." *Gonzalez*, 610 F.2d at 249 (citations omitted). The critical distinction in the continuing violation analysis, therefore, is whether the plaintiffs complain of "the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (citations omitted).

*Knight v. Columbus, Ga.*, 19 F.3d 579, 580-581 (11th Cir. 1994), *cert. denied*, 15 S. Ct. 318 (1994) (applying Title VII cases to the Fair Labor Standards Act).

[19]One set of guidelines, adopted by a number of courts, instructs a court to look to several factors, including (1) the subject matter, whether the acts involve similar types of discrimination, (2) the frequency, whether the acts are isolated incidents or everyday occurrences, and (3) the degree of permanence, whether the act is likely to trigger the victim's awareness of and duty to assert her rights. *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983), *cert. denied*, 479 U.S. 868 (1986); *see also Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 800-01, *withdrawn on rehearing by* 850 F.2d 1549 (11th Cir. 1988); *Clark v. City of Macon, Ga.*, 860 F. Supp. 1545, 1550 (M.D. Ga. 1994).

be viewed in the aggregate. *Hull v. Case Corp.*, 1993 WL 603554 (S.D. Fla. 1993)(unpublished); *see e.g., Stockett v. Tolin*, 791 F. Supp. 1536 (S.D. Fla. 1992) (allowing the plaintiff to plead incidents spread over several years, where those incidents taken together created a hostile environment and where the last of those incidents occurred within the limitations period).

Whether alleged discriminatory acts constitute a continuing violation is a finding of fact. *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993); *Patterson v. Augat Wiring Systems, Inc.*, 944 F. Supp. 1509, 1518 (M.D. Ala. 1996). However, as always, if there is no reasonable factual inference, the issue must be determined as one of law. Based on the facts as construed in plaintiff's favor, a reasonable factual inference does exist that the alleged discriminatory practices of defendants formed a pattern of discrimination that injured Mr. Harris. Specifically, according to Mr. Harris, Mr. Brazeal has engaged for years in a pattern of discriminatory interference with Harris's authority. The record reflects that incidents have been occurring, and Mr. Harris has been complaining about them, since at least 1993, if not 1986.

Unfortunately for Mr. Harris, this argument proves a little too much. Even under the continuing violation doctrine, courts do not have infinite patience. The victim cannot sit back and permit violations to accumulate, especially when he is aware of his rights. In *Roberts v. Gadsden Memorial Hospital*, 850 F.2d 1549, 1550, (11th Cir. 1988), the Eleventh Circuit considered whether time-barred acts of the defendant could form the basis of a claim, even if they were part of a continuing violation, if the plaintiff was aware of his rights at the time of the violation. The court said:

23

[E]ven if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that [plaintiff's] claim based on the incident is time barred. [Plaintiff] admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that [defendant] injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights. A claim arising out of an injury which is continuing only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period.

*Id.*; *see Sabree v. United Brotherhood of Carpenters and Joiners No. 33*, 921 F.2d 386, 402 (1st Cir. 1990) ("'what matters is when and to what extent the plaintiff was on inquiry notice'")(citation omitted); *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir. 1989); *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983), *cert. denied*, 479 U.S. 868 (1986) (most important question in evaluating continuing violation is "whether the act is likely to trigger the victim's awareness of and duty to assert her rights"). Thus a plaintiff who believes his rights are being violated by similar, repeated slights is not entitled to rely on the continuing violation doctrine to revive old claims. *See, e.g., Lane v. Huckaby*, 1998 WL 427553, at *10-11 (M.D. Ala. 1998) (plaintiff repeatedly passed over for promotion to the same position could not sue for time-barred injuries because she "was aware - at least she believed - she had been discriminated against" each time).

Mr. Harris's own affidavit indicates that he has believed for years that Mr. Brazeal's treatment of him was discriminatory. He intentionally failed to raise this issue in his 1993 grievance, and choose not to bring an EEOC charge until *August 14, 1996*, almost three years later. Therefore, he cannot rely on the continuing violation doctrine to revive claims

24

he should have brought long ago.[20] Any actions taken before February 16, 1998 are time-barred and cannot form the basis of a claim in this lawsuit.

### 2.    Timely Claims.

The plaintiff can point to only a handful of actions taken by the Board within the 180 days preceding his EEOC filing. Only the activities immediately surrounding the disciplinary proceeding fall close enough to plaintiff's EEOC filing to be timely. The only relevant actions mentioned by either party thus seem to be: 1) Ms. Staggs' request for a disciplinary proceeding; 2) the proceeding itself; 3) Mr. Young's decision to place Mr. Harris on administrative leave.

As noted above, to make out his *prima facie* case based on these discipline-related actions, Mr. Harris must show that a similarly situated employee was treated less harshly. *Holifield v. Reno*, 115 F.3d 1555, 1555 (11th Cir. 1997). The Eleventh Circuit has indicated that, in disciplinary cases, a fairly tight fit is required between the allegedly wrongful acts of the plaintiff and those of the "similarly situated" comparators. "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998). Defendants argue that, because Mr. Harris has not

---

[20]Even if the continuing violation doctrine applied, the court doubts that the disciplinary proceeding against Mr. Harris, the only event which plaintiffs has cited that falls within the 180 day window and so are timely, is similar enough to the past interferences with Mr. Harris's authority to allow him to invoke the continuing violation theory. The disciplinary proceeding is different both in the type of action taken, and in who was doing the acting. *See Hackaby v. Moore*, 142 F.3d 233, 239-40 (5th Cir. 1998) (demotion and failure to promote too dissimilar to a time-barred pattern of harassment to resurrect claims based on the harassment); *Sabree v. United Brotherhood of Carpenters and Joiners No. 33*, 921 F.2d 386, 399, 401 (1st Cir. 1990) (plaintiff must show a "substantial relationship" between the time-barred acts and a timely violation, including that they "emanat[ed] from the same discriminatory animus").

compared his situation to that of other Officers in Charge with severe problems in their offices, he has failed to make out a *prima facie* case. The court cannot agree.

A supervisor who has engaged in racial discrimination in the past cannot use the effects of his past discrimination as a "neutral" cover for his current racially discriminatory program. Thus, where a supervisor has taken discriminatory action against an employee in the past, the effects of these actions must be sorted out from real misbehavior by the plaintiff in assessing the plaintiff's "similarly situated" status.[21] For example, a supervisor who has given an employee years of bad evaluations for racially discriminatory reasons cannot then fire that employee because of his race and claim that the employee cannot make his *prima facie* case because of the previous tainted evaluations.[22] The employee should be allowed to show that the evaluations resulted from past racial discrimination, and

---

[21] The court is aware that the Eleventh Circuit has indicated that a plaintiff can "not use time-barred evidence of allegedly discriminatory . . . practices in order to establish a prima facie case." *Turlington v. Atlanta Gas and Light Co.*, 135 F.3d 1428, 1434 (11th Cir. 1998). However, *Turlington* involved a decision that was otherwise "not discriminatory on its face" and relied heavily on Supreme Court precedent dealing with the effect or previous discrimination on an otherwise neutral decision. *Id.* at 1434-35. Thus the court reads *Turlington* not as an absolute bar to considering time-barred evidence in evaluating a *prima facie* case, but as a corollary to the well-established rule that an action which represents only the "'present consequence of a one-time violation,'" and does not constitute a new violation in itself, can not serve as a vehicle for updating time-barred claims. *See Beavers*, 975 F.2d at 796. This reading of *Turlington* is supported by the *Turlington* court's distinction between the case before it, in which time-barred evidence was not allowed, and cases in which the plaintiff is endeavoring to prove pretext via time-barred evidence, in which the evidence is allowed. *See Turlington*, 135 F.3d at 1436. The *prima facie* case is designed to be a low hurdle for plaintiffs to leap, because the entire purpose of the *McDonnell Douglas* framework is to assist plaintiffs who cannot directly prove discrimination to make their case. It would be a singularly odd rule that would allow a plaintiff to prove pretext, and so perhaps show intentional discrimination, but nevertheless bar the plaintiff from court because the *prima facie* case could not be made. In this court's view, *Turlington* holds only that time-barred evidence is not alone enough to make a *prima facie* case. It can serve to support a *prima facie* claim that a timely action is itself motivated by discriminatory intent. This is entirely consistent with the Supreme Court's instruction that a time-barred act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Airlines v. Evans*, 431 U.S. 553, 558 (1983).

[22] This should be distinguished from a case in which a completely neutral decision maker acts on those same evaluations, which raises the problem discussed in *Turlington. See supra.*

have the "similarly situated" analysis focus instead on his *actual* past performance. Mr. Harris's situation is more complicated, but calls for the same analysis.

At this stage, it is unclear whether Mr. Harris has been a terrible manager, or has filled his position as well as could be expected in light of the claimed racist actions of his supervisor. Viewed in the light most favorable to Mr. Harris, the evidence indicates that Mr. Brazeal began limiting Mr. Harris's authority long before any problems developed in the office, and that Mr. Brazeal's activities were a significant part of the problem. Admissible evidence indicates that Mr. Brazeal limited Mr. Harris's authority from the very beginning, and often intervened on the side of white employees and in opposition to their direct supervisor, Mr. Harris.[23] A situation of racial polarization certainly developed in the office, with allegations and cross-allegations of racism. Mr. Harris claims this was the fault of Mr. Brazeal's long-standing racial animosity towards him. He has sufficient evidence to submit this question to a jury. The court cannot and will not decide whether the chicken or the egg came first at this stage of the proceedings. What is presently clear is that there is both a chicken and an egg. The jury will have to decide which is responsible for the other.

---

[23] For example, even ignoring the generalized allegations of racism contained in the affidavits of Mr. Harris and Ms. Clark, which are due to be stricken, *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 & n.6 (11th Cir. 1998), these affidavits contain sufficient evidence to raise a question of fact about whether Mr. Brazeal was improperly restricting Mr. Harris's authority from the very beginning. Mr. Harris averred that, before he was put in charge, Mr. Brazeal had granted the white Officer in Charge significant authority over the parole officers in the office. This practice ended when Mr. Harris, a black, assumed the post. *Plaintiff's Exhibit 20*. Ms. Clark averred that Mr. Brazeal gave instructions directly to the clerical staff during Mr. Harris's tenure as Officer in Charge, and had not done so previously. *Plaintiff's Exhibit 1, Attachment A*. Both Mr. Harris and Ms. Clark had worked in the office previously, and were well aware of Mr. Brazeal's prior treatment of parole officers and secretaries respectively. Their averments are thus based on "observation and other grounds of personal knowledge," *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 660 (7th Cir. 1991), are not due to be stricken, and raise a factual question about the even-handedness of Mr. Brazeal's treatment of Mr. Harris.

With this background in mind, the court finds a question of material fact regarding Mr. Harris's good or bad performance in his post, which affects the choice of comparators and precludes summary judgment on plaintiff's *prima facie* case. The court notes that, as discussed further below, it finds virtually no evidence of racial discrimination on the parts of Ms. Staggs or Mr. Young. The analysis outlined above is premised on Mr. Brazeal's alleged discrimination, and will apply only to the extent that he influenced the disciplinary decision. "Disparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias." *Jones v. Gerwen*, 874 F.2d 1534, 1542 n.13 (11th Cir. 1989). Because the evidence at this point indicates that his report (or reports) were relied on in the decision to proceed against Mr. Harris, Mr. Brazeal's influence on the decision is a factual question left for trial.

In response to the plaintiff's *prima facie* case, defendants have advanced Mr. Harris's misbehavior and the resulting problems in the office as a legitimate nondiscriminatory reason for disciplining him. Because Mr. Harris has made supportable allegations that Mr. Brazeal engaged in a racially motivated campaign against him that began long before any problems developed in the Tuscaloosa office, and because of Mr. Brazeal's questionable role in the racially polarized conflicts in the office, the court finds sufficient evidence of pretext to present a question for the jury. Therefore, defendants' motion for summary judgment as to the plaintiff's Title VII race discrimination claim will be denied.

The court will, however, issue a *caveat* to clarify the issues for trial. The evidence outlined above is probative only to the extent that Mr. Brazeal influenced the disciplinary

decisions. Despite plaintiff's effort to tar Ms. Staggs and Mr. Young with the same brush, the court can identify almost no evidence of racial discrimination on the part of these decision makers. Plaintiff's evidence of pretext and discriminatory intent as to these actors seems to consist of "Defendant Staggs' decision to reassign secretarial duties to secretaries under the plaintiff's supervision, . . . Defendant Staggs' failure to investigate the allegations contained in the plaintiff's January 29, 1996 grievance . . ., and Defendant Young's decision to convene a disciplinary hearing without confirming whether an unbiased investigation of the plaintiff's race discrimination grievance had been conducted." *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order* at 7-8. In essence, plaintiff argues pretext because the problems were really Mr. Brazeal's fault. *See id.* at 11-12.

These allegations are simply not sufficient to raise a question about the motivations of either Ms. Staggs or Mr. Young. When Ms. Staggs first came on the scene in Tuscaloosa, the office was already in a troubled state. Regardless of who was originally responsible for the problem, Ms. Staggs was greeted with, and continued to receive, complaints by the employees in the office which overwhelmingly pointed the finger at Mr. Harris. She rapidly became heavily involved in the inner workings of the office. Indeed, many of the actions Mr. Harris ultimately complained of in his grievance were initiated by her. The court finds her rapid response to the grievance insufficient to support an inference of racial malice.[24] Ms. Staggs' quick action indicates only that, through a year of investigation, she already

---

[24]Indeed, the court notes that Roy Brown's positive response to Mr. Harris's earlier grievance was similarly swift, and presumably also based on his prior knowledge of the politics in the Tuscaloosa office.

29

had identified in her own mind the source of the problems in the Tuscaloosa office, and it was not Mr. Brazeal. Whether she was right or wrong, her assessment was amply supported by the complaints she had received, and is amply supported in the record before this court. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwen*, 874 F.2d 1534, 1540 (11th Cir. 1989). The plaintiff has not presented the court with any evidence which calls into doubt Ms. Staggs' honesty in assessing the situation. His claims about Mr. Young, still one step further removed from any evidence of possible discrimination, are also insufficient to support a Title VII claim. Therefore, Mr. Harris will be allowed to proceed only on the theory that Mr. Brazeal improperly influenced the otherwise neutral decisions of Ms. Staggs and Mr. Young.

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present "significantly probative" evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). Mr. Harris has carried this burden with respect to decisions influenced by Mr. Brazeal, but has not adduced proof of wrongful motive on the part of Ms. Staggs and Mr. Young. Because material issues of fact remain, Mr. Harris is entitled to proceed to trial to prove that Mr. Brazeal influenced the decision to discipline him, and did so with a discriminatory intent.

30

## B.   Retaliation Claim.

The defendants also seek summary judgment on Mr. Harris's retaliation claim[25] based upon their contentions that Mr. Harris cannot sustain his *prima facie* case or prove pretext. *Movants' Initial Submission in Response to Exhibit D of the Court's Order*, at 11-12, 15-17. In order to make out a prima facie case of retaliation, Mr. Harris must show (1) that he was engaged in statutorily protected expression, (2) that the Board took adverse employment action against him, and (3) a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. 1981). The defendants argue that Mr. Harris cannot establish either the second or the third elements of his retaliation claim. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 11-12; *Movant's Reply Submission in Response to Exhibit D of the Court's Order*, at 10. They essentially concede his January 1996 grievance satisfies the first element. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (protected activities include formal and informal complaints to an employer).

As to the second element of her retaliation claim, the parties dispute whether the Board took an "adverse employment action" against Mr. Harris because of his complaints. The Eleventh Circuit has recently made it clear that "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.

---

[25] Title VII protects employees from discrimination by their employer "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3.

1998). In *Wideman*, the court held that written reprimands and a one day suspension, coupled with other mistreatment, constituted a sufficient adverse action to support a claim for retaliation. Applying *Wideman*, a judge in the Southern District of Georgia has concluded that a supervisor's recommendation that a subordinate be disciplined, which led ultimately to a two week suspension, itself constituted an adverse employment action. *Naia v. Deal*, 1998 WL 42719, at *12 (S.D. Ga.). Under this flexible standard, the disciplinary proceeding, which Mr. Harris claims forced him into a transfer, especially when coupled with Ms. Staggs' recommendation and Mr. Young's imposition of administrative leave, almost certainly qualifies as an adverse employment action. For the purposes of summary judgment, there is sufficient evidence upon which a reasonable jury might find an adverse employment action.

To satisfy the third element of her prima facie case of retaliation, Mr. Harris must show a causal connection between the protected expression and the adverse employment action. In the Eleventh Circuit, this requirement is interpreted broadly; "a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *EEOC v. Riechhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1991). The timing of an action alone may be almost sufficient to satisfy this standard. *See id.* at 1572 ("the cumulative effect of these actions and their timing . . . was sufficient to meet the plaintiff's initial burden."). The evidence here shows not only that Mr. Brazeal's report, and Ms. Staggs' recommendation, followed close on the heals of his grievance, but also demonstrates a direct link between the two. Ms. Staggs's recommendation refers

32

specifically to the grievance. This is enough to satisfy Mr. Harris's minimal burden as to the third element. Therefore, a reasonable jury could find the required causal connection.

The defendants' argument of pretext constitutes a much closer issue. For the reasons outlined above in discussing race discrimination, the court concludes that Ms. Staggs and Mr. Young were amply justified in their decisions, and there is no evidence sufficient to raise a factual issue as to their motivations. However, because of Mr. Brazeal's earlier conduct, there is a factual issue regarding his motivations. Because the record contains evidence suggesting that he may have influenced the disciplinary decisions, summary judgment will be denied. Again, the court cautions that Mr. Harris must prove at trial that Mr. Brazeal played a role in the disciplinary decisions, and that he was motivated by retaliatory animus. The court will not allow the case to go to the jury on any other theory.

### C.    Section 1981 Claims.

Defendants argue that plaintiff's claim under section 1981 is subsumed by his section 1983 claim. Plaintiff does not contest this point, and this court agrees. "[T]he express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989). This means that plaintiff's claim is properly recharacterized as a section 1983 claim, though based not directly on the constitution but on the contractual rights specifically guaranteed by section 1981. "Thus to prevail on his claim for damages against the [Board], [plaintiff] must show that the violation of his 'right to make contracts' protected by § 1981" also

33

satisfies the requirements of section 1983's remedial scheme. *Id.* at 735-36. However, because the Equal Protection clause already provides protection as broad or broader than section 1981, plaintiff's section 1981 claim is essentially duplicative and "we need not address it separately." *Busby v. City of Orlando*, 931 F.2d 764, 771-72 n.6 (11th Cir. 1991). Plaintiff's section 1981 claims will be dismissed and considered as additional grounds for his section 1983 claims.

### D.    Section 1983 Claims.

To state a claim pursuant to 42 U.S.C. § 1983, Mr. Harris must demonstrate that a person has acted "under color of any statute, ordinance, regulation, custom, or usage of any State" to deprive him of any "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Mr. Harris claims that the defendants violated his Fourteenth Amendment right to equal protection under the laws, and violated the rights guaranteed to him by section 1981 by "depriv[ing] him of employment and contractual opportunities." *Amended Complaint* at 6.

The individual defendants assert that they are entitled to qualified immunity, and, consequently, the section 1983 claims against these defendants should be dismissed. *Movant's Initial Submission in Response to Exhibit D of the Court's Order*, at 18-23. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right may

34

only be clearly established where "the contours of the right [are] sufficiently clear [so] that a reasonable official . . . understand[s] that what he is doing violates that right." *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 470 (11th Cir. 1996). Qualified immunity almost always protects government actors; "only in exceptional cases will [they] have no shield against claims made against them in their *individual capacities*." *Lassiter*, 28 F.3d at 1149 (emphasis in original). In fact, qualified immunity almost always applies to damages claims, but as the Eleventh Circuit has noted, "the defense is a narrow one, leaving plaintiffs other avenues of relief." *Id.* at 1149 n. 2. A plaintiff may bring a claim for damages against government actors in their official capacity absent Eleventh Amendment immunity or may seek injunctive relief. *Id.*

The Eleventh Circuit has established a two-part analysis for qualified immunity claims. The initial burden is on the public official to establish, at the time of the occurrence of the matters complained of, that he was acting within the scope of his discretionary authority. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). Then, in order to impose liability upon defendant government officials, the plaintiff must establish the absence of objective good faith by demonstrating that "the official's alleged misconduct was 'objectively unreasonable' in that it violated clearly established law." *Schopler v. Bliss*, 903 F.2d 1373, 1380 (11th Cir. 1990) (quoting *Harlow*, 457 U.S. at 818). "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

35

Qualified immunity is applicable only to claims for monetary relief made against public officials acting in their individual capacities. In the case at bar, the plaintiff has made such claims against Mr. Brazeal, Ms. Staggs, and Mr. Young in their individual capacities. *See Amended Complaint* at 2-3.

As already discussed, according to Mr. Harris, Mr. Brazeal routinely undermined his supervisory authority because of his race; Mr. Brazeal and Ms. Staggs solicited complaints from white employees after he filed his grievance based on Mr. Brazeal's purported racial discrimination; and Mr. Young initiated disciplinary action against him as a result of plaintiff's grievance. Defendants suggest that it is not clearly established that these actions constituted violations of Mr. Harris's rights. In most cases, standards with the requisite specificity are not available, and the qualified immunity defense applies. This is one of the rare situations, however, where, given plaintiff's version of the facts, case law makes it clear that the actions taken may be violations. It is clear that in 1996, when the great majority of the actions giving rise to the plaintiff's claims took place, the Eleventh Circuit had determined that the equal protection right to be free from racial discrimination was "clearly established."[26] *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991) (citing *Washington v. Davis*, 426 U.S. 229, 239-41, 96 S. Ct. 2040, 2047-48, 48 L. Ed. 2d 597 (1976)). Hence, if, as Mr. Harris alleges, defendants Brazeal, Staggs, and Young violated his right to equal protection of the laws, they unquestionably would not be immune from civil liability in their individual capacities. The proper standard was well-known as well, and

---

[26] The court assumes that the statute of limitations will bar claims under section 1983 for some of the earlier employment actions. This issue has not been briefed or argued by the parties, however, and so will not be discussed.

36

tracks the analogous standard of Title VII. "When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements of the two causes of action are the same. To establish a violation of the fourteenth amendment equal protection clause [the plaintiff] must prove a discriminatory motive or purpose." *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980). Thus, as described above, defendants violated plaintiff's rights if they took an adverse action with discriminatory intent. Defendant's focus on the objective specifics of their conduct, *see Movant's Reply Submission in Response to Exhibit D of the Court's Order*, at 9, misses the central question. The focus must be not on *what* defendants did, but *why* they did it. If the disciplinary action taken was taken for racial reasons, defendants committed a clear violation of plaintiff's equal protection rights and are not entitled to qualified immunity.

The Eleventh Circuit has directed courts to make this assessment of intent in deciding the question of qualified immunity. "A government actor, however, cannot violate a plaintiff's equal protection rights unless the defendant has the intent to discriminate. Concomitantly, the actor cannot know he is violating clearly established equal protection rights unless he harbors discriminatory intent. Thus, even though intent is not "conduct" per se, a district court must make a determination regarding intent as part of the first prong of its qualified immunity inquiry." *Mencer v. Hammonds*, 134 F.3d 1066, 1070-71 (11th Cir. 1998) (citations omitted). The court has also cautioned that the causation defense created by *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1997) must be considered in assessing defendants' intent. *Foy v. Holston*, 94 F.3d 1528 (11th Cir.

1996).[27] Thus defendants are entitled to immunity (and indeed even without immunity to victory on the section 1983 claims), if Mr. Harris cannot establish a racially discriminatory motive for their actions, or if they can prove that they would have taken the actions even in the absence of that improper motive.

For the reasons already discussed, the court concludes that Mr. Harris can sustain a viable claim only against Mr. Brazeal. The evidence of Mr. Brazeal's early conduct is sufficient to raise a jury question about his motive. The actions taken by Ms. Staggs and Mr. Young, on the other hand, were taken on the basis of serious problems with Mr. Harris's performance, fully documented in the record. Mr. Harris simply does not have the evidence required for a reasonable jury to conclude that defendants Staggs and Young intentionally discriminated against him. Therefore summary judgment is due to be granted on the plaintiff's claims against these two defendants, both in their individual and official capacities.[28]

Mr. Harris can pursue his claims against Mr. Brazeal in both his individual and official capacities.[29] However, he can claim only racial discrimination. Claims for retaliation because of complaints about discrimination arise under the First Amendment, not the Equal

[27] To the extent that *Foy* requires a court to shift the balance of proof on a *Mt. Healthy* defense in defendants' favor, or to rely on an objective assessment of the possible reasons for defendants' conduct, its precise holding may be called into question by the Supreme Court's recent decision in *Crawford-El v. Britton*, 118 S. Ct. 1584 (1998). The court need not reach this question, however, because the factual situation before it is relatively clear-cut and the nuances of *Foy* are therefore not outcome determinative.

[28] While qualified immunity does not protect against official capacity claims, plaintiff has failed to present the evidence of discrimination required to prove his basic case under section 1983. Qualified immunity aside, summary judgment is still proper.

[29] The court assumes that the plaintiff will have to meet additional requirements to proceed against Mr. Brazeal in his official capacity, with what in essence is a suit for injunctive relief against the Board. However, this issue has not been briefed or argued by the parties so the court will ignore it for now.

Protection clause, *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997), and plaintiff's complaint nowhere mentions the First Amendment. *See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359 (11th Cir. 1998). To the extent that plaintiff's claims involve pure retaliation, rather than racial animus, they are due to be dismissed.

Accordingly, the defendants' motions for summary judgment on plaintiff's section 1983 claims as to the individual defendants are due to be granted as to defendants Staggs and Young and denied as to Defendant Brazeal.

## V.   CONCLUSION.

The defendants' motion for summary judgment will be granted in part and denied in part. The court will enter an appropriate order in conformity with this memorandum opinion.

Done, this ____30th____ day of September, 1998.

_____
Edwin L. Nelson
United States District Judge